**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSSETTS**

| | |
|---|---|
| JULIE MAATTALA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KOCHAVA INC.,<br><br>Defendant. | Civil Action No.: 1:22-cv-11473-IT<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Julie Maattala ("Plaintiff"), by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge, against Defendant Kochava Inc. ("Kochava" or "Defendant").

## NATURE OF THE ACTION

1. Kochava violates state law by first acquiring and tracking consumers' precise geolocation data and other data through the use of spyware called "Kochava SDK" or "Tracking SDK," and then profiting from that data by selling it to others. The data can include consumers' movements to and from sensitive locations, like locations associated with medical care, reproductive health, religious worship, mental health, temporary shelters, such as shelters for the homeless, domestic violence survivors, addiction recovery, or other at-risk populations.

2. Plaintiff is an individual who asserts claims on behalf of herself and other similarly situated individuals for unjust enrichment and violations of consumer protection statutes.

### A. Kochava Tracks And Identifies Users In "Real Time"

3. Kochava operates two business units. Its primary business involves the use of the Tracking SDK spyware to "identify" people in "real-time." Kochava developed and marketed the spyware, which is found on many different mobile applications.

4. For example, Kochava states that the so-called "IdentityLink™" feature of its spyware "provides an API to support the linkage between a user device and their identity in your application," which is "useful when trying to tie users across multiple devices…for example mobile and desktop users."

5. Kochava has admitted that "[t]he Kochava SDK [aka Tracking SDK] deals with potentially sensitive data such as device identifiers."

6. In another example, Kochava described how its business is based in part on "real-time" identification and gathering of consumers' data:

> Kochava Inc. is a **real-time data** solutions company offering the leading omni-channel measurement and attribution solutions for data-driven marketers. The Marketers Operating System™ (m/OS) from Kochava empowers advertisers and publishers with a platform **that seamlessly integrates and manages customer identity, measurement, and data controls**. Unlike the complicated, siloed tech stacks employed today, the m/OS takes the next step: unifying all of your data and critical omni-channel solutions into a cohesive, operational system that goes beyond data aggregation and reporting.

(Emphasis added).

7. Kochava has stated that data is transmitted whenever a user runs a mobile application that has the Tracking SDK spyware installed on it.

8. Even if an individual were aware of the spyware, they would have no ability to disable the transmissions.

9. The Tracking SDK spyware always transmits the IP address of the user, which is used to derive location information for purposes of analytics and reporting.

10. Kochava built settings that allow its application developer clients to ignore people's tracking preferences by simply toggling an override switch. Kochava said this capability was designed so that companies could track customers across apps and websites.

11. Thus, through the use of its spyware, Kochava monitors, tracks, and identifies consumers in "real time," including Plaintiff and other putative class members in Massachusetts.

**B. Kochava Sells Precise Location Information for Hundreds of Millions of Mobile Devices**

12. Kochava is, among other things, a location data broker that provides its customers massive amounts of precise geolocation data collected from consumers' mobile devices. Through Kochava's services, customers can "[l]icense premium data" including the "precision location" of a consumer's mobile device, and a timestamp of when a person was at the location.

13. Kochava calls this data arm of its business "the Kochava Collective," which it refers to as a "proprietary data marketplace."

14. Kochava populates the Kochava Collective with data received from device users.

15. Kochava claims that it has obtained consent from device users but has identified no such consent.

16. Kochava sells customized data feeds to its clients to, among other purposes, assist in advertising and analyzing foot traffic at stores or other locations. Among other categories, Kochava sells timestamped latitude and longitude coordinates showing the location of mobile devices. For example, in the Amazon Web Services ("AWS") Marketplace, a website through which customers could subscribe to Kochava's data feed until approximately June 2022, Kochava displayed the following table explaining the data it sells:

| Field name | Description | Example | Data type |
|---|---|---|---|
| device_id_value | Unique device ID associated with the device | - | string |
| device_id_type | Device type associated with the device ( IDFA and ADID only ) | - | string |
| activity_timestamp | Timestamp of when the device hits the location | - | timestamp |
| latitude | Precise latitude of the device | - | string |
| longitude | Precise longitude of the device | - | string |
| horizontal_accuracy | Horizontal accuracty of the precision of the lat and lon ( in meters) | - | string |
| ip_address | IP Address of the device | - | string |

17. As noted in Kochava's explanation, each pair of timestamped latitude and longitude coordinates is associated with a "device_id_value," which is also known as a Mobile Advertising ID ("MAID").

18. A MAID is a unique identifier assigned to a consumer's mobile device to assist marketers in advertising to the consumer.

19. Although a MAID may be changed by a consumer, doing so requires that a consumer (1) know how to do so; and (2) proactively reset the MAID on the consumer's mobile device.

20. In describing its product in the online marketplace, Kochava has asserted that it offers "rich geo data spanning billions of devices globally."

21. Kochava has said that its location data feed "delivers raw latitude/longitude data with volumes around 94B+ geo transactions per month, 125 million monthly active users, and 35 million daily active users, on average observing more than 90 daily transactions per device."

### C. Kochava Provides Public Access to Consumers' Location Data

22. Kochava has sold access to its data feeds on online data marketplaces that are publicly accessible.

23. Kochava typically charges a monthly subscription fee of thousands of dollars to access its location data feed but has also offered a free sample (the "Kochava Data Sample").

24. Kochava has made the Kochava Data Sample publicly available with only minimal steps and no restrictions on usage.

25. For example, the Kochava Data Sample was available on the AWS Marketplace until approximately June 2022. To access the Kochava Data Sample on the AWS Marketplace, a purchaser needed a free AWS account. A purchaser would then search the AWS marketplace for "Kochava," which resulted in two available datasets appearing – a $25,000 location data feed subscription and the Kochava Data Sample.

26. The Kochava Data Sample consisted of a subset of the paid data feed, covering a rolling seven-day period. It was formatted as a text file, which could be converted into a spreadsheet. Put into a spreadsheet, one day of the Kochava Data Sample contained over 327,480,000 rows and 11 columns of data, corresponding to over 61,803,400 unique mobile devices.

27. When an AWS purchaser clicked on the "subscribe" button for the Kochava Data Sample feed, the purchaser was directed to a screen that included a "Subscription terms" notification that stated that the Kochava Data Sample "has been marked by the provider [i.e., Kochava] as containing sensitive categories of information:"



**2a. Subscription terms**

This product has been published as part of the Extended Provider Program and has been marked by the provider as containing sensitive categories of information. The Extended Provider Program is in Preview and subject to Section 2 of the AWS Service Terms ("Betas and Previews").

By submitting this subscription request, you agree that your use of this product is subject to the provider's offer terms including pricing information and Data Subscription Agreement.

You also agree and acknowledge that AWS may share information about this transaction (including your payment terms and product usage metrics) with the respective seller, reseller or underlying provider, as applicable, in accordance with the AWS Privacy Notice. AWS will issue invoices and collect payments from you on behalf of the provider through your AWS account. Your use of AWS services remains subject to the AWS Customer Agreement or other agreement with AWS governing your use of such services.

28. Below this notice, a form was displayed, requesting the purchaser's company name, name of the purchaser, email address, and intended use case:


Company name
The legal entity that will use the product.
AnyCompany
0 out of 40 characters maximum.

Name
The name of the company's contact person.
Jane Doe
0 out of 40 characters maximum.

Email address
The email address of the company's contact person.
janedoe@example.com
0 out of 100 characters maximum.

Intended use case
Your intended use case for the data product, including any comments that the provider might find relevant to approving your subscription request.
We will be using this data product for an academic research project supervised by Jane Doe.
0 out of 500 characters maximum.

29. A purchaser could use an ordinary personal email address and describe the intended use simply as "business." The request would then be sent to Kochava for approval. Kochava has approved such requests in as little as 24 hours.

30. Once Kochava approved the request, the purchaser was notified by email and then gained access to the data, along with a data dictionary explaining the categories of data provided.

31. The Kochava Data Sample included precise location data gathered in the seven days prior to the date Kochava approved the subscription request.

### D. Kochava's Data Can Be Used to Identify People and Track Them to Sensitive Locations

32. Precise geolocation data associated with MAIDs, such as the data sold by Kochava, may be used to track consumers to sensitive locations, including places of religious worship, places that may be used to infer an LGBTQ+ identification, domestic abuse shelters, medical facilities, and welfare and homeless shelters.

33. By plotting the latitude and longitude coordinates included in the Kochava data stream using publicly available map programs, it is possible to identify which consumers' mobile devices visited reproductive health clinics. Further, because each set of coordinates is time-

stamped, it is also possible to identify when a mobile device visited the location. Similar methods may be used to trace consumers' visits to other sensitive locations.

34. The location data provided by Kochava is not anonymized, or alternatively, is easily de-anonymized. It is possible to use the geolocation data, combined with the mobile device's MAID, to identify the mobile device's user or owner. For example, some data brokers advertise services to match MAIDs with "offline" information, such as consumers' names and physical addresses. And, as noted above, an entire arm of Kochava's business is aimed at "identifying" users.

35. Even without such services, however, location data can be used to identify people.

36. The location data sold by Kochava typically includes multiple timestamped signals for each MAID.

37. By plotting each of these signals on a map, much can be inferred about the mobile device owners. For example, the location of a mobile device at night likely corresponds to the consumer's home address. Public or other records may identify the name of the owner or resident of a particular address. Indeed, Kochava has recognized that its data may be used to track mobile devices to home addresses. In its marketing on the AWS Marketplace, it has suggested "Household Mapping" as a potential use case of the data:

**HOUSEHOLD MAPPING:**
Group devices by dwelling time and frequency at shared locations to map individual devices to households.

38. Kochava employs no technical controls to prohibit its customers from identifying consumers or tracking them to sensitive locations. For example, it does not employ a blacklist that removes from or obfuscates in its data set location signals around sensitive locations including, among others, locations associated with medical care, reproductive health, religious

worship, mental health, temporary shelters, such as shelters for the homeless, domestic violence survivors, or other at-risk populations, and addiction recovery.

### E. Kochava's Practices Cause and Are Likely to Cause Substantial Injury to Consumers

39. As described above, the data sold by Kochava may be used to identify individual consumers and their visits to sensitive locations. The sale of such data poses an unwarranted intrusion into the most private areas of consumers' lives and causes or is likely to cause substantial injury to consumers.

40. For example, the data may be used to identify consumers who have visited an abortion clinic and, as a result, may have had or contemplated having an abortion.

41. In fact, in just the data Kochava made available in the Kochava Data Sample, it is possible to identify a mobile device that visited a women's reproductive health clinic and trace that mobile device to a single-family residence. The data set also reveals that the same mobile device was at a particular location at least three evenings in the same week, suggesting the mobile device user's routine. The data may also be used to identify medical professionals who perform, or assist in the performance, of abortion services.

42. As another example, the data could be used to track consumers to places of worship, and thus reveal the religious beliefs and practices of consumers.

43. In fact, the Kochava Data Sample identifies mobile devices that were located at Jewish, Christian, Islamic, and other religious denominations' places of worship.

44. As another example, the data could be used to track consumers who visited a homeless shelter, domestic violence shelter, or other facilities directed to at-risk populations. This information could reveal the location of consumers who are escaping domestic violence or other crimes.

45. In addition, because Kochava's data allows its customers to track consumers over time, the data could be used to identify consumers' past conditions, such as homelessness.

46. In fact, the Kochava Data Sample identifies a mobile device that appears to have spent the night at a temporary shelter whose mission is to provide residence for at-risk, pregnant young women or new mothers.

47. As another example, the data could be used to track consumers who have visited addiction recovery centers. The data could show how long consumers stayed at the center and whether a consumer relapses and returns to a recovery center.

48. Identification of sensitive and private characteristics of consumers from the location data sold and offered by Kochava injures or is likely to injure consumers through exposure to stigma, discrimination, physical violence, emotional distress, and other harms.

49. These injuries are exacerbated by the fact that, as described above, Kochava lacks any meaningful controls over who accesses its location data feed, including the Kochava Data Sample.

50. The collection and use of consumer location data are opaque to consumers, who typically do not know who has collected their location data and how it is being used. Indeed, once information is collected about consumers from their mobile devices, the information can be sold multiple times to companies that consumers have never heard of and never interacted with. Consumers have no insight into how this data is used – they do not, for example, typically know or understand that the information collected about them can be used to track and map their past movements and that inferences about them and their behaviors will be drawn from this information. Consumers are therefore unable to take reasonable steps to avoid the above-described injuries.

51. The harms described above are not outweighed by countervailing benefits to consumers or competition. Defendant could implement safeguards to remove data associated with sensitive locations from its data feeds. Such safeguards could be implemented at a reasonable cost and expenditure of resources.

## PARTIES

52. Plaintiff Julie Maattala is a citizen of Massachusetts who resides in Shirley, Massachusetts. As recently as June 2022, Defendant sold Plaintiff's data, including but not limited to her geolocation data, that Defendant acquired through Plaintiff's use of a third party application on her mobile device. Plaintiff Maattala did not consent to Defendant's misappropriation of her data.

53. Specifically, Defendant sold Plaintiff's geolocation data that it obtained, without Plaintiff's consent or knowledge, from Plaintiff's use of the McDonald's phone application. Defendant offers for sale the geolocation data of users of the McDonald's phone application (including Plaintiff's) to anyone with an internet connection.

54. Defendant Kochava Inc. ("Kochava") is a Delaware corporation with its principal place of business at 201 Church Street, Sandpoint, Idaho 83864. Kochava transacts or has transacted business in this District and throughout the United States. Kochava does not have a place of business in Massachusetts and does not have assets in Massachusetts.

## JURISDICTION AND VENUE

55. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

56. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial portion of the events that gave rise to this cause of action occurred here.

57. This court has personal jurisdiction over Defendant because a substantial portion of the events giving rise to this cause of action occurred here. Plaintiff is domiciled and suffered her primary injury in this district.

58. Kochava has been registered with the Massachusetts Secretary of State since at least February 9, 2018, and has designated an agent for service of process in Boston. Accordingly, Kochava has consented to jurisdiction in this state.

59. As part of its ordinary business practice, Kochava surreptitiously monitors and tracks the activities of Massachusetts consumers in real-time, including tracking their location for marketing purposes. This information includes device identifier information that Kochava admits is potentially sensitive, and geolocation information. Kochava then purposely adds this information from Massachusetts consumers to its Kochava Collective database for sale to third parties.

60. For the last ten years, Massachusetts has consistently ranked as one of the most prosperous states in the United States, including during the height of the COVID-19 pandemic. Companies have a correspondingly high interest in marketing to Massachusetts consumers, which in turn increases the value of data about those consumers. As a result, Kochava has derived substantial revenue from the surreptitious collection and sale of data about Massachusetts consumers.

61. Kochava knowingly obtains data regarding Massachusetts consumers.

62. As a result of its geo-location tracking, Kochava intentionally identifies Massachusetts consumers, compiles data about Massachusetts consumers, and sells data about Massachusetts consumers.

63. Kochava's tracking and sale of Massachusetts consumer data is repeated and intentional; it is not random, fortuitous, or attenuated.

**FTC'S AUGUST 2022 ACTION AGAINST DEFENDANT**

64. In August 2022, the FTC took action against Defendant for allegations that are substantially identical to this complaint. *Federal Trade Commission v. Kochava, Inc.*, Case No. 2:22-cv-00377-BLW.

65. According to the FTC's complaint, Defendant's "Unfair Sale of Sensitive Data," as described above constitutes a violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits "unfair or deceptive acts or practices in or affecting commerce."

66. Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

**CLASS REPRESENTATION ALLEGATIONS**

67. Plaintiff seeks to represent a class defined as all persons in the United States whose data, including but not limited to their geolocation data, was sold by Defendant without their consent (the "Class").

68. Plaintiff also seeks to represent a subclass defined as all Class members who reside in the Commonwealth of Massachusetts whose data, including but not limited to their geolocation data, was sold by Defendant without their consent (the "Massachusetts Subclass").

69. Subject to additional information obtained through discovery, the foregoing class definitions may be modified or narrowed by an amended complaint, or at class certification,

including through the use of multi-state subclasses to account for material differences in state law, if any.

70. Members of the Class and Massachusetts Subclass are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class and Massachusetts Subclass number in the millions. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

71. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include but are not limited to whether Defendant's sale of geolocation data without consent constitutes unjust enrichment.

72. The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff's data was sold by Defendant without her consent, and the named Plaintiff suffered injury as a result of Defendant's conduct.

73. Plaintiff is an adequate representative of the Class and Massachusetts Subclass because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

74. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation

increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
## Unjust Enrichment

75. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

76. Plaintiff brings this claim individually and on behalf of members of the Class and the Massachusetts Subclass against Defendant.

77. Plaintiff and Class members unwittingly conferred a benefit upon Defendant. Defendant acquired valuable personal location information belonging to Plaintiff and Class members which it then sold to other parties without the consent of Plaintiff and Class members. Plaintiff and Class members received nothing from this transaction. Plaintiff lacks an adequate remedy at law, and pleads this cause of action in the alternative to the extent Plaintiff is required to do so.

78. Defendant has knowledge of such benefits.

79. Defendant has been unjustly enriched in retaining the revenues derived from the sale of Plaintiff's and Class members' data, including their geolocation data. Retention of those moneys under these circumstances is unjust and inequitable because Defendant did not obtain the consent of Plaintiff and Class members before selling their data to third parties as described above.

80. Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Class members for its unjust enrichment, as ordered by the Court.

**COUNT II**
**Violation of the Massachusetts Unfair and Deceptive Business Practices Act, Mass. Gen. Laws Ch. 93A *et seq.***

81. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

82. Plaintiff brings this claim individually and on behalf of the members of the Massachusetts Subclass against Defendant.

83. Section 2 of Chapter 93—the Massachusetts Unfair and Deceptive Business Practices Act ("93A")—prevents the use of "unfair or deceptive acts or practices in the conduct of any trade or commerce."

84. It is "the intent of the legislature that in construing" whether an act is deceptive under 93A § 2, "the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended." *See* Mass. Gen. Laws Ann. ch. 93A, § 2.

85. An act or practice is a violation of 93A if it "violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes within the purview of M.G.L. c. 93A, § 2." 940 CMR 3.16.

86. Section 9 provides: "Any person … who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two … may bring an action in the superior court … for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper … Any persons entitled to bring such action may, if the use or employment of the unfair or deceptive act or practice has caused similar

injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of herself and such other similarly injured and situated persons."

87. Pursuant to the definitions codified in Chapter 93A § 1, Defendant is a "person," and Defendant is engaged in "trade" and "commerce" in Massachusetts by engaging in the purchase and sale of Products that directly or indirectly affect the people of Massachusetts.

88. By engaging in the acts and omissions alleged above and incorporated herein, Defendant has engaged and continues to engage in unfair or deceptive acts or practices in the conduct of trade or commerce.

89. Defendant's misrepresentations deceive and have a tendency to deceive a reasonable consumer and the general public.

90. Defendant's acts and omissions are material, in that a reasonable person would attach importance to the information and omissions described above and would be induced to act on the information in deciding to use services such as phone applications.

91. Defendant has also committed a violation of 93A predicated on its violations of FTC regulations – specifically, its violation of Section 5 of the FTC Act as interpreted by the Federal Trade Commission.

92. Plaintiff and members of the Massachusetts Subclass were deceived by Defendant's policies and in fact had no idea that Defendant was selling their location data.

93. Plaintiff and members of the Massachusetts Subclass did not consent to Defendant's sale of their location data.

94. Defendant in conjunction with third party phone and internet applications knowingly omitted that Defendant had access to and was selling the location data of Plaintiff and the class.

95. Had Plaintiff and Massachusetts Subclass members known that the Defendant was selling their data, they would either have ceased to use the relevant phone applications or would have requested compensation for the misappropriation and sale of their location data.

96. Plaintiff and Massachusetts Subclass Members were injured as a direct and proximate result of Defendant's breach because Defendant misappropriated and sold the location data of Plaintiff and Massachusetts Subclass members without consent.

97. Plaintiff and members of the Massachusetts Subclass have been harmed by this injury, adverse consequence, and/or loss.

98. 93A represents a fundamental public policy of the Commonwealth of Massachusetts.

99. For each loss, Plaintiff and each member of the Massachusetts Subclass may recover an award of actual damages or twenty-five dollars, whichever is greater. Ch. 93A § 9(3).

100. Disgorgement of profit derived from an unfair and deceptive act or practice is a permissible damage remedy under G.L. c. 93A, § 9.

101. Accordingly, Plaintiff and the members of the Massachusetts Subclass seek the disgorgement of profits that Defendant derived from the sale of their location data.

102. Because Defendant acted willfully or knowingly, Plaintiff and each member of the Massachusetts Subclass may recover up to three but not less than two times this amount. In addition, Plaintiff may recover attorneys' fees and costs.

103. Plaintiff and each member of the Massachusetts Subclass may recover an award of actual damages (in this case unlawful profit derived from the sale and trading of location data) or twenty-five dollars, whichever is greater. Ch. 93A § 9(3).

104. Plaintiff and the members of the Massachusetts Subclass may also seek the imposition of an injunction relief which limits and polices Defendant's representations within or

reaching Massachusetts. The balance of the equities favors the entry of permanent injunctive relief against Defendant. Plaintiff, members of the Massachusetts Subclass, and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiff, members of the Massachusetts Subclass, and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Defendant's unlawful behavior is capable of repetition or re-occurrence absent the entry of a permanent injunction.

105. In accordance with Mass. Gen. Laws Ch. 93A, § 9(3), on September 16, 2022, Plaintiff's counsel served Defendant with written notice of its violation of Ch. 93A and a demand for relief. A true and correct copy of the letter is attached hereto as **Exhibit 1**. Defendant did not make a written tender of settlement for the putative class.

**RELIEF DEMANDED**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. For an order certifying the nationwide Class and the Massachusetts Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and the Massachusetts Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and the Massachusetts Subclass members;

b. For an order declaring that Defendant's conduct violates the laws referenced herein;

c. For an order finding in favor of Plaintiff, the nationwide Class, and the Massachusetts Subclass on all counts asserted herein;

d. For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e. For prejudgment interest on all amounts awarded;

f. For an order of restitution and all other forms of equitable monetary relief;

g. For an order enjoining Defendant from continuing the illegal practices detailed herein and compelling Defendant to undertake a corrective advertising campaign; and

h. For an order awarding Plaintiff and the Class and Massachusetts Subclass their reasonable attorneys' fees and expenses and costs of suit.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims so triable.

Dated: November 15, 2022

Respectfully submitted,

**REARDON SCANLON LLP**

By: */s/ James J. Reardon, Jr.*
James J. Reardon, Jr.

James J. Reardon, Jr. (BBO# 566161)
45 South Main Street, 3rd Floor
West Hartford, CT 06107
Telephone: (860) 955-9455
Facsimile: (860) 920-5242
Email: james.reardon@reardonscanlon.com

**BURSOR & FISHER, P.A.**
Julian C. Diamond (*pro hac vice)*
888 Seventh Avenue
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jdiamond@bursor.com

**BURSOR & FISHER, P.A.**
Joel D. Smith (*pro hac vice)*
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: jsmith@bursor.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 15, 2022, a true and correct copy of the forgoing was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ James J. Reardon, Jr.*
James J. Reardon, Jr.